Case number 251713, McCord Henry v. Martin Blank et al., oral argument, not to exceed 15 minutes per side. Mr. Bell for the appellant. Morning, your honors. Good morning. On behalf of Appellant McCord Henry, Ms. Henry's son, who's present in the courtroom today, at this time I'd like to reserve three minutes for rebuttal. Very well. Thank you. Tsk, tsk, the Women's Resource Center is going to complain again, followed by vulgarities. With these words, the defendant deputies in this case expressed in the clearest terms imaginable discriminatory animus towards women. Now, these words were not simply offhand remarks, and they were not remarks made just at women. These were remarks made at the Women's Resource Center, which is an organization that has a very mission of advocating for and helping victims of domestic violence and sexual abuse. They help them obtain PPOs, provide shelter to victim advocates, and otherwise advocate for equality and protection for women. Regarding stated discriminatory intent, this court in Robinson v. Can I start with standing? Yes. So I see two potential theories of standing, and I just wanted to talk about each. Obviously, standing has a three-part test, injury causation, and redressability. So I see one theory that's unrelated to the death, so it would be just the unequal treatment that is alleged. So the Supreme Court has said unequal treatment and applying for a benefit, which would here be police protection, can provide a basis for standing, even apart from whether you get the police protection. What I'm struggling with on that theory of standing is the victim didn't really call the police. It was other women who called the police on the murderer. So I don't see where her equal protection rights would be violated. I would analogize, maybe, to say a university has a racially discriminatory admissions policy. Not everybody of the race that is discriminated against can sue over that policy. The Supreme Court has said you have to be ready and willing to apply. And so by analogy here, maybe there has to be some suggestion that the victim applied for police protection or sought police protection. And I just don't see any of that in the complaint. Yes, Your Honor. And I think the Castle Rock case is very distinguishable from this because Castle Rock was an entitlement case. It was a due process case claiming the right to the enforcement of a PPO and an arrest. Here, that's not what we're alleging. What we're alleging is that the discriminatory animus so infected the police department that their policing decisions were affected by said discriminatory animus. But are there any allegations? So I see allegations that they refused to arrest him because these other women complained. But that would be the equal protection rights of the other women. And the victim was just an unfortunate bystander to the discriminatory policy applied against them. So yeah, the constitutional violation would be being subject to the discriminatory conduct in policing. And the third intervening criminal act, that's the question also. And that would speak more to the harm or the damages associated with it. That's the position that we're arguing here. So what is your theory of what is the Article III injury? Is it the unequal protection? Or the second theory is obviously that the murder itself is an Article III injury, for sure. That's obvious. So is that the theory? Or is it the unequal treatment that is the theory of the injury? Well, it's both, Your Honor. So I think at this stage, the motion to dismiss stage, the harm is being subject to the police, the discriminatory police protection or the discriminatory police action in police protection. And the level of harm associated with that is a factual issue. Again, we haven't had the opportunity to conduct discovery in this case. All we have are CAD conversations and certain things. But it does set forth a series of patterns of behavior, events, and stated discriminatory intent in policing decisions, specifically in policing decisions involving this murder. But I still, for the unequal treatment theory, it was, to be honest, I just, I mean, if the victim had been a man, I think the victim, do you think the victim could have sued under that unequal treatment theory? No, Your Honor. Well, why not? Because the actual unequal treatment was, these women over here asked for this man to be arrested. Because of the alleged unequal treatment theory, he was not arrested. And if the man then goes and murders somebody else who wasn't really involved with the police, I mean, your theory of standing is that third party should be able to sue to enforce the equal protection violation for these other folks who complained. Your Honor, it's not just that these specific instances or that specific instance. I grant you, you've pled. But like you say in your brief, which I thought was helpful, imagine if they hadn't expressed policy of discrimination. So fine. You still have to show that that policy was applied to the person who has sued, so the victim here. And I'm just not seeing where those pleadings are, because the pleadings suggest it was applied to the other women who complained. Yeah, so again, I think it goes back to the harm itself as being the subject to it. And then the policing decisions that were made that night that were affected by the discriminatory animus included taking steps over to Stratton's house. That's it. Nothing else was done. That just so happens to be right next door directly, from here to that window away, from Ms. Henry's house. And then going back and falsely assuring these females that they were all set for the night, implying that something was done, some level of protection was afforded to them, that they could let their guard down. And it's not just let their guard down. They were so frightened that they had taken up arms. A 14-year-old had taken up arms. And the issue here is that then, this is at night. In the morning, they, presumably based on information that these deputies passed along to the prosecutor's office, sanitized the versions of events for that evening, simply stating that he walked over, they refused to let him in, flipped off, and then walked home. There's no record or no reference to the actual fear, the actual conduct of Stratton. And again, it speaks to the various interactions that these deputies had with Stratton. Each instance, they're minimizing the complaints of women. This goes back, also, something that's referenced in the brief. In a brief review, a Michigan State police investigator in reviewing the file, a part separate from the Benzie County deputies, noticed in his brief assessment that Stratton has a propensity to violate or to victimize women. This is another law enforcement officer looking at this pattern of behavior for this defendant, for this perpetrator, in recognizing his propensity to victimize women. Not only are these deputies then, when they're not responding, or when they're making the decision to tell these people they're all set for the night, or to not warn, or to even do anything to protect the minor and her mom, or Ms. Henry, who's literally next door, they simply walk away and lie about the events surrounding it. So would they have had an obligation, the sheriff's department, to protect the whole neighborhood? I mean, there was no way to know that he would go over to Ms. Henry's house, as opposed to any other neighbor anywhere around. Why do you think that there's some obligation because it happened to be Ms. Henry? Who had never complained to the sheriff's office about Stratton. And your honor, we're not arguing that they'd have an obligation to do or to warn the entire neighborhood. What we're arguing is that, sure, they could have done not necessarily the neighborhood. They could have done the immediate vicinity. They could have even helped the TW and AW, the family there. But the simple fact is, based on their practice and policy of discriminating towards women, they did nothing. In fact, they did less than nothing. They actively hurt the chances that Ms. Henry and neighbors had at any sort of assistance by then lying in the report of what happened that evening. So again, I just want to be very clear. We're not alleging the right on Ms. Stratton or anyone to have the arrest of a third party. What we're alleging, and what gives rise to the claims here, is that the defendant deputies should not have been, but were motivated by an improper discriminatory animus in their policing decisions. Well, you know, the two deputies that came out to TW's house the night before were not the two deputies that you say made these comments a month or years earlier, are they? They're the different deputies. That's correct, your honor. And there's nothing in the record that I saw as to the two deputies that came out the night before the murder that showed any bias against women. And your honor, if I may address that. The first communications, the suck it women, eat a bag of dicks, nom nom nom, that's Deputy Weaver and Deputy Blank in April of 2020. In September, you have Deputy Blank, Deputy Weaver, and Deputy Packard. This is the NPS Ranger incident, where a man in a black ski mask shows up at our house saying, I know where you work, I know where you live. They, in addressing the issue, joke around about it's just Hutch, allegedly a former BCSO deputy messing around, quote unquote. And then in that pass along information, they leave information out, meaning that they don't communicate the full extent of what's happening. And then following that, in January, you have the, apologize, it's February, you have the Stratton being arrested for sexually assaulting the neighbor and violating the PPO that they had, or violating the release order, and going next door. And in that instance, that's when you have Kasaboski responding to it. And then the pattern of behavior extends beyond just Weaver and Blank. And I do want, I know we only have a little bit of time left. The key there is, TISC, the Women's Resource Center, is going to complain again, implying that the Women's Resource Center had raised complaints previously to the BCSO, enough so that these deputies were aware of those complaints. Clearly, it went to a higher level. And despite being on notice of those complaints, they were able, or felt, and were able to act without consequence in their communications and subsequent actions. Any further questions at this time, Judge Gilman? Not at this time. Judge Murphy, all right. Mr. Bell, you'll have your three minutes rebuttal. Good morning. Good morning. Douglas Curlow on behalf of the Defendants Hyphenapolis. When counsel opened his presentation, I was thinking the same thing, obviously, that Judge Gilmore was. Wait a minute. Gilman. Gilman, I'm sorry. Gilman was the- You just destroyed your perfect case. Thank you, thank you. Wait a minute, the CAD conversation was Blank and Weaver. The responders on February 3rd to the report by TW about the potential threat to her and AW was Kosoboski and Packard. There's no connection, even if we assume, even if we assume that the 2020 CAD conversations between Blank and Weaver are indicative of some discriminatory animus on their parts anyway, there's no way to impute that to Packard and Kosoboski, who no contact whatsoever is alleged between them and Stratton or any of the incidents prior. Counsel's representation at the very close that they were involved in the Hutch incident, that all four deputies were involved in the Hutch incident, I've got my cheat sheet on the various incidents, and I don't see that Kosoboski and Packard were cited for being involved in the Hutch incident at all. That was, again, just Blank and Weaver. This was the first contact, the first allegations we have of any action involving Packard and Kosoboski are the events of February 3rd, 2022. And there is no way to impute animus to them from any of the prior incidents or, I mean, there's just, the connection just isn't there. I want to ask you, just starting with standing, do you concede that the death itself is an Article III injury? No. I believe that this, you've got to have an injury that is fairly traceable. Yeah, it's a three-part test. Yes, you've got to have an injury that's fairly traceable from a constitutional violation. Fairly traceable to the defendants. By your defendant. And redressable. In this case. So let's not talk about fairly traceable. Let's not talk about redressable. Let's talk about Article III injury. So is a death an Article III injury? Is a death an Article III injury? In and of itself, it could be if the other factors are implied, are cited. Well, Article III injury is just one of the three elements of standing. And I'm only asking about the first element. So I think you're saying yes, which strikes me as a wise concession. So why wouldn't it be fair? It's under the complaints theory, the reason why the police did not arrest this man is because of their bias against women. Now, so why wouldn't it be fairly traceable to that policy? Because but-for causation is met. The victim, Mrs. Henry, would not have died but-for this discriminatory policy. There's no evidence. There's no allegations that give any plausible basis to conclude that there is this overarching policy within the department. As I just pointed out a moment ago, there's nothing to tie Packard and Kossobowski to it. All we've got is the only thing that is blatantly. There was, though. So that means that this theory then would come down to whether the complaint plausibly pleads the discrimination? Or discrimination that can be imputed across the other deputies. Like I say, even if we assume the CAD conversations are evidence of discriminatory thoughts on the part of Blank and Weaver, you can't just blanket spread that out to all the other deputies in the department, or especially not to Kossobowski and Packard, who responded. The requirement of the complaint is that they have to plead the plausible elements. Factual matter would support a plausible claim that the incident involved caused a constitutional injury traceable from those actors to the victim. And we just don't have that in this case. This is just, oh, look, I found a CAD conversation. Let's just say that everybody in the department must have known about it and must have been involved in it. They must all share this. I mean, there's just no factual matter to suggest that that's the case. What I find somewhat tricky is whether that's a standing question, or it's like a merits question that they haven't plausibly pleaded an equal protection claim. Well, of course, the district judge looked at it both ways. My focus has been more on the fact that. What's tricky for us is we have a duty to ensure ourselves of jurisdiction. And so we have to ensure standing before the merits. So do you think that that's a merits question or a standing question, whether it was plausibly pleaded that this policy exists? As far as pleading that the policy exists, I think that's actually a merits question. As far as the question of whether you can tie the incident involving AWTW at their house to Linda Henry next door, that becomes the question of whether you can assert a claim that's really more tied to the traceability of a potential injury to that party. And that's where the traceability gets lost, is because we're dealing with different people. We've got these two people in the one house. I got that. That's why I thought it was if the Supreme Court's case law is really vague on what fairly traceable means. But-for-cause is one of the easiest tests for causation. And I see a, I mean, given accepting the premise that there was a plausibly pleaded policy, it seems to me that you would say it's fairly traceable. Because if this policy didn't exist, they would have arrested the guy. And if they had arrested the guy, Mrs. Henry wouldn't have been murdered. Well, even that's a bit of a stretch, because we've got Kosovowski and Packard responding to a specific incident at a specific time. And as I point out at length in the brief, one of the elements is not only do you have to show that there's unequal treatment, that there's unequal application of law enforcement authority on behalf of one sex or gender over the other, but you have to show first that there was a right to the police action in the first place. First, you have to have a right to a particular police action, and then there has to be uneven or unequal application of that right between men and women. And we don't even have the violation in the first place, because there is no specific right to have another person arrested. As we point out, even in situations where you've got PPOs and restraining orders, the Castle Rock case and then the two cases I said from this court, Howard and the name of the other one escapes me at the moment, both those cited in the brief say that it's always discretionary whether officers make an arrest. And there's a lot of factors to go into it. Isn't it odd that the previous case we just heard argued, although I don't know all the details of that, we have officers, the co-defendants, the officers, reacted to a threat, and here they are being sued for having reacted to a threat. That's the bind that police officers are in, that law enforcement officers are in. You're damned if you do, you're damned if you don't. I could just as easily be standing here as I often am in front of this court trying to defend officers against a Fourth Amendment claim that they should not have arrested somebody, because the circumstances didn't justify it. And that's why, of course, that would take us to our qualified immunity argument, which I think is fully briefed. You know, there's just no right to have another person arrested. It's interesting, I like to watch some old noir movies from the 30s and 40s, Huntley, Bogart, and that sort of thing. What's the stuff the police do there? Oh, round up all the suspects. Don't worry about probable cause or reasonable suspicion or any of the things we've imposed. And the representations of police and police conduct in those movies from the 30s and 40s, as a modern lawyer looking at it, you're just aghast. But of course, those are things that we've developed since the 1950s to the present, that police are much more bounded than they used to be. It's very difficult to know, you're arrested, you're not arrested. And that's why we give them that immunity, because they have to make these hard decisions. And in this case, we've got a situation where officers had to make a decision. And they have that discretion of whether they arrest in a specific situation or not, even in a case where there's a violation of an order, like might have given probable causes, argued by the plaintiff in this case. But again, the big problem here is what they've brought as an equal protection claim. And there's no basis to impute any kind of discriminatory animus or discriminatory conduct to Packard and Kosobowski, who were the responding officers to the TWAW complaint on the night of February 3rd. And that's where the complaint completely falls apart. And where, despite very lengthy allegations, you just can't prevail on the claim that's been brought. It has not been pleaded plausibly. And in fact, the prior instances, if you were to get into, again, the factors that would have to be pleaded, I mean, you've got an animal control situation in 2010. You've got an employee discrimination claim in 2012. These aren't even police matters. I mean, the litany of events that are tried to be, to demonstrate this supposed unequal treatment, even by themselves looking at them, they don't give any implication of discriminatory animus on the basis of gender. Much less that they would show a pattern within the police department that had been acted upon by Kosobowski and Packard on February 3rd, to prevent them from arresting Stratton. Anyway, I've never been in front of an appellate court that didn't know my brief better than I do. And I think everything else has been briefed. And I'm just going to start going in circles and repeating stuff so there's no more questions. Judge Gelman, any further questions? No, I'm OK. Thank you. Thank you very much, Mr. Curlow, for your argument. Mr. Bell, you've got three minutes rebuttal. Thank you, Your Honor. Briefly, going back to Troy Packard, which was one of the deputies, we do include, it's paragraph 174, where Troy left a lot of stuff out of that pass-along. Troy, our allegation is that that's the Troy that's being referenced there. I just wanted to point that out as far as a connection between the two. Two, this is not simply a bad policing case. This is structural discrimination throughout the BCSO. Poor policing can turn on a bad actor or just one negligent occurrence. This is, as opposing counsel mentioned, this goes back years and years and years and involves many deputies, multiple, multiple deputies. And as referenced in Grote, a municipal may still be liable for inflicting a constitutional injury, even if an individual officer is unable to be found liable for so. I just wanted, again, to raise that. And just in closing, the equal process, equal protection guarantees neutrality, not perfection. The complaint plausibly alleges neutrality was abandoned here. We're only asking that the court reverse and allow discovery. All right, any further questions? Judge Gilman? Just curious, what did the district court do as far as the state claims? Did it rule on that or just declined to take them up? Declined to exercise jurisdiction, Your Honor. Okay, so you might have a valid state court claim based on the police access, et cetera. But the question we've gotta face is the equal protection, right? Because that's the sole issue on appeal. Am I correct about that? Yes, Your Honor. Okay, no further questions. Any questions, Judge Morgan? Thank you. All right, thank you, Mr. Bell, for your arguments. The case will be submitted.